# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| Sara F. Whitehouse,<br><br>Plaintiff,<br><br>vs.<br><br><br>UNUM Life Insurance Company of America,<br><br>Defendant. | Case No.: _____<br><br><br>**PLAINTIFF'S COMPLAINT** |

## INTRODUCTION

Early in the pandemic, Plaintiff, a physician at a St. Paul hospital, became severely ill with what her treating physicians presumed to be COVID-19. Plaintiff developed viral cardiomyopathy, a form of heart failure. Although she recovered from the cardiomyopathy, Plaintiff also developed several other medical issues attributed to the COVID-19 infection including severe dyspnea, vocal cord dysfunction, extreme fatigue, chronic pain, depression, and anxiety.

Plaintiff's various medical conditions totally disabled her from work for about nine months. Then Plaintiff returned to work on a very part-time basis with the plan to increase work ability gradually. Over the

ensuing months, Plaintiff slowly expanded her work capacity while undergoing extensive medical treatments, alternative therapies, and a 3-week partial inpatient pain program at the Mayo Clinic.  Eventually, Plaintiff regained the ability to earn 80% of her pre-illness earnings, making her not disabled anymore under the terms of her long-term disability policy.

Although Plaintiff was entitled to benefits under the long-term disability policy for approximately fourteen months, the disability insurer paid for only four and a half months.  Plaintiff now seeks the additional long-term disability benefits due.

## GOVERNING LAW, JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to the jurisdictional provision of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 *et seq.*, 29 U.S.C. §1132(e)(1), and federal question jurisdiction under 28 U.S.C. §1331.

2. Venue is proper in this district pursuant to 29 U.S.C. 1132(e)(2).

## PARTIES

3. Plaintiff Sara F. Whitehouse lives in the City of St. Paul, Minnesota.

4. Plaintiff is employed by M Health Fairview (f/k/a Fairview Health Services)(collectively "Fairview") which operates hospitals and clinics in Minnesota and Wisconsin, including St. Joseph's Hospital in St. Paul, MN.

5. Defendant UNUM Life Insurance Company of America ("UNUM") is an insuring subsidiary of UNUM Group which is a publicly traded company with its headquarters located in Chattanooga, Tennessee. UNUM provides group disability insurance products. At all times, UNUM was authorized to sell disability insurance in the State of Minnesota.

6. Fairview sponsored a short-term disability ("STD") benefit plan for its employees that was administered or insured by UNUM.

7. Fairview also sponsored a long-term disability ("LTD") benefit plan for its employees that was funded through a group insurance policy issued by UNUM under group policy number 609377 ("the LTD policy").

8. UNUM was the duly appointed claims administrator and claims review fiduciary for the STD and LTD plans identified above.

## TERMS OF THE LTD POLICY

9. The LTD policy was issued January 1, 2020.

10. The LTD policy is governed by ERISA and the non-preempted laws of the State of Minnesota.

11. The LTD policy defines disability for physicians in Plaintiff's class as follows:

> *you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury and You have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.*

12. Although the LTD policy contains language purporting to grant UNUM discretionary authority to decide entitlement to benefits, this language is unenforceable pursuant to Minn. Stat. §60A.42.

## FACTUAL ALLEGATIONS

### *Plaintiff's Employment and Duties*

13. Plaintiff is a licensed M.D. and is board certified in family medicine and addiction medicine.

14. In March of 2020, Plaintiff was employed as a full-time hospitalist and addiction medicine specialist assigned to the inpatient substance use treatment unit at St. Joseph's Hospital in St. Paul, MN. She additionally provided inpatient consultation on the other medical units of the hospital.

15. Plaintiff's job required her to work in the hospital and treat acutely ill patients admitted because of mental health and substance use issues.

16. The job required Plaintiff to stand and walk to all parts of the St. Joseph's Hospital campus throughout the workday; work for 40+ hours a week; speak clearly and fluently for extended periods of time; use high level intellectual skills constantly; and maintain emotional stability despite patient circumstances that were often quite fraught.

*COVID-19 Outbreak*

17. During March of 2020, the Governor of Minnesota declared a state of emergency because of the arrival of COVID-19.

18. At that time, there was minimal or no personal protective equipment ("PPE") available for healthcare workers – including those working in a hospital setting.

19. St. Joseph's Hospital was designated as a COVID-19 patient deployment center and so the facility where Plaintiff worked also housed numerous patients being cared for solely due to their COVID-19 infections.

20. Plaintiff was at risk of contracting the COVID-19 virus every day.

21. On 3/19/20, without access to PPE, Plaintiff cared for a patient admitted for addiction services and Plaintiff assisted in transferring the patient who at that time was showing evidence of possible COVID-19 infection.

*Viral Illness in March of 2020*

22. In late March of 2020, Plaintiff's wife became ill. She was down for several days with a bad flu/cold. Then the couple's toddler became sick. Although Plaintiff and her wife feared that the illnesses might be COVID-19, there was no way to confirm the diagnosis at that point in the pandemic.

23. On 3/21/20, Plaintiff became quite sick with nausea, fatigue, abdominal pain, and widespread body aches. She was triaged virtually by a medical provider who diagnosed presumed COVID-19. There was no way to test Plaintiff to confirm a COVID-19 infection at that point in the pandemic.

24. Plaintiff returned to work within a week of the acute onset of her illness where she continued to be exposed to COVID-19.

*Extended Symptoms*

25. About three weeks later, Plaintiff started experiencing symptoms of extreme shortness of breath ("dyspnea").

6

26. Plaintiff had had asthma for many years, but the dyspnea she was then experiencing was different from anything she had experienced before. She took Albuterol (asthma medication) throughout the day with only minimal relief.

27. Plaintiff also began experiencing symptoms of extreme fatigue. She was dragging herself to work and then collapsing at home. This, too, was very unusual for Plaintiff who had a history of athleticism that included completing multiple marathons and triathlons.

28. As March became April in 2020, Plaintiff's symptoms of dyspnea and fatigue worsened. Additionally, by the last week of April 2020, Plaintiff developed a cough.

### *First ER Visit*

29. Plaintiff's symptoms continued to worsen and by 5/7/20, she was struggling to get out of bed.

30. Plaintiff went to a COVID-19 testing site associated with her primary care clinic and spoke with her primary care provider ("PCP").

31. Plaintiff reported being very winded and having great difficulty speaking. She felt too fatigued to go to work. She was feeling lightheaded and experiencing severe nausea.

32. Plaintiff's PCP instructed Plaintiff to go to the ER immediately.

33. Plaintiff went to St. Joseph's Hospital where the ER doctor thought Plaintiff was having an asthma exacerbation and prescribed a steroid burst.

34. By 5/11/20, however, Plaintiff's symptoms were even worse, and her asthma medications were not improving things. Plaintiff experienced significant dyspnea as well as lowered oxygen saturation rates.

### *Second ER Visit*

35. Later that week Plaintiff's oxygen saturation rate dropped to well below normal while she was walking the brief distance to her kitchen, and she was severely dyspneic.

36. Plaintiff returned to the St. Joseph's ER on 5/13/20 where she was advised that her dyspnea and related symptoms might be due to anxiety or might be evidence of a heart condition that could not be detected in the ER. The ER physician told Plaintiff to follow-up with the rapid access cardiology clinic.

37. Plaintiff followed up with the rapid access cardiology clinic where she had an echocardiogram ("Echo") on 5/21/20. The Echo

showed Plaintiff's left ventricular ejection fraction ("LVEF") was decreased and was estimated to be only 47%.

38. An Ejection Fraction ("EF") between 40-49% is below normal and considered to be mild heart failure or cardiomyopathy.

39. Given the severe viral illness Plaintiff had been experiencing and the proximity of that illness to the discovery of cardiomyopathy, Plaintiff's treating physicians concluded that the virus she had acutely in March-April caused Plaintiff's cardiomyopathy in May of 2020.

40. But the degree of dyspnea and the extent of fatigue Plaintiff was experiencing seemed more than would be expected in a patient who had an EF of 47%.

41. Plaintiff saw her PCP on 5/28/20 who encouraged further follow-up with cardiology and pulmonology to try and understand what was occurring.

42. Plaintiff saw a pulmonologist on 6/1/20. The pulmonologist felt Plaintiff was demonstrating an unusual form of dyspnea and that it was a sequelae of the virus. The pulmonologist recommended pulmonary function testing and a cardiac MRI.

43. Plaintiff underwent the pulmonary function testing on 6/2/20 and the cardiac MRI on 6/5/20. The cardiac MRI showed an EF

9

of 50%--on the borderline of mild heart failure. It also showed some mild left ventricle hypokinesis which Plaintiff's cardiologist attributed to a decline in systolic function due to a virus.

44.    At that point, it was mid-June of 2020. Plaintiff was unable to do many of the things that she needed to do to live her life. She could not climb stairs without taking breaks to rest. She was so tired that she rarely had the strength to put her toddler to bed and certainly could not carry him up the stairs. She could not speak normally without being short of breath. She could not walk with the stroller further than about a block before becoming too fatigued. If she did try to walk with her family, she had to bring along a portable sit-stool so she could stop and rest regularly.

45.    Plaintiff and her wife decided that a consultation at the Mayo Clinic was in order.

### *July 2020 Visits to the Mayo Clinic*

46.    Plaintiff's first visit to the Mayo Clinic began on 7/17/20 and extended for several days with visits to cardiology, pulmonology, and sleep medicine.

47.    At the culmination of this testing, Plaintiff was informed her EF had improved to a normal level so she could discontinue the

cardiomyopathy medications. However, stress testing showed deconditioning and Plaintiff needed to undergo a conditioning program.

48. Furthermore, the cardiologist and the pulmonologist agreed that Plaintiff's ongoing, severe dyspnea was likely being caused by a vocal cord dysfunction caused by the virus. The two specialists recommended evaluation by Mayo Clinic's speech therapy department.

*Follow-Up Care for Vocal Cord Dysfunction at Mayo Clinic*

49. On 7/31/20, Plaintiff was seen at the Mayo Clinic Speech and Language Department where a speech and language therapist ("SLT") concluded Plaintiff was suffering from dysphonia and a maladaptive breathing pattern (also called paradoxical vocal cord movement). The SLT explained this condition can occur following viruses and the recommended treatment is speech therapy and training in mindfulness and stress management.

50. Plaintiff began speech therapy and had five (5) therapy treatments between 8/7/20 and 12/3/20.

51. When Plaintiff returned to the SLT on 10/30/20, she was having an exacerbation of symptoms that by then also included a persistent very sore throat.

11

52. When Plaintiff saw the SLT again on 12/3/20, there had been no improvement in the sore throat. Plaintiff explained that she had been doing her prescribed vocal exercises and yet her throat was getting very raw and was worse whenever Plaintiff went out into cold air or talked for any length of time. The throat issue was also impacting Plaintiff's breathing.

53. The SLT provider referred Plaintiff to a doctoral-level SLT. The doctoral-level SLT ("DSLT") saw Plaintiff seven (7) times between 12/14/20 and 4/29/21.

54. At the first visit on 12/14/20, the DSLT noted Plaintiff was experiencing raw throat pain from exertion or talking. Additionally, Plaintiff had developed chronic neck and shoulder pain.

55. With the DSLT, Plaintiff worked on exercises to improve breathing, improve her vocal quality and sustainability, and lessen Plaintiff's neck and shoulder pain.

56. This treatment was helping Plaintiff speak without severe dyspnea, but Plaintiff continued to have daily throat pain and hoarseness with a spasm-like cough whenever she talked.

57. On 2/8/21 the DSLT arranged for a consultation with a Mayo Clinic otolaryngologist.

58. The otolaryngologist diagnosed Plaintiff's throat and coughing issues as neurogenic cough a/k/a sensory neuropathic cough.

59. The otolaryngologist told Plaintiff that since her problem was so persistent and had not responded to any of the other treatments (*i.e.,* speech therapy, voice, and breathing therapy), the next step would be to perform superior laryngeal nerve ("SLN") block injections into both sides of Plaintiff's neck.

60. Plaintiff had a SLN injection of the right side of her neck on 2/24/21 and the left side on 3/2/21.

61. When Plaintiff returned to her DSLT on 3/16/21, the DSLT noted: "[following the SLN block procedures Plaintiff was] *able to talk for a full 30 minutes plus without fatigue."* But this effort lasted only during the 2 hours Plaintiff was able to work. The DSLT planned to see Plaintiff back in a month to continue working towards the eventual goal of a functional voice capable of full work duties.

62. When Plaintiff returned to the DSLT on 4/29/21, she had improved further but was still dependent on wearing an ear plug (a devise prescribed as part of the speech therapy) and the DSLT reiterated that they were still working toward the goal of achieving full-time work capacity for use of the voice and wean Plaintiff from the use of an ear plug.

*Medical Treatment by Other Providers for Sequelae of Virus*

63. In addition to the breathing/coughing/throat pain/speech care just described, Plaintiff also underwent significant care for the other medical issues which developed following the virus.

64. To assure coordination of her care and monitor the progress of all facets of Plaintiff's medical issues that developed after the COVID infection, Plaintiff treated with her PCP.

65. From September of 2020 forward, Plaintiff's PCP was Dr. Ann Barry.

66. Dr. Barry saw Plaintiff in multiple visits, received medical reports from Plaintiff's other providers, made recommendations for additional care, oversaw the timing of Plaintiff's disability leave, established the graduated return to work plan, and set the appropriate restrictions and limitations for Plaintiff's return to work.

67. In addition to her PCP, Plaintiff had ongoing medical treatment from specialists in cardiology, pulmonology, sleep medicine, occupational medicine, pain medicine, integrative medicine, and physical and occupational therapy. These providers were in the Twin Cities and the Mayo Clinic.

68. Plaintiff's traditional medical treatment culminated in a three-week partial inpatient program at the Mayo Clinic's Comprehensive Pain Rehabilitation Center ("CPRC") where Plaintiff was a patient June through July of 2021.

### *Treatment with Non-Allopathic Providers*

69. Plaintiff also had care with non-allopathic providers to address her pain, fatigue, and deconditioning.

70. Plaintiff treated with a Doctor of Osteopathic Medicine ("D.O") who used osteopathic manipulative treatments to alleviate her chronic pain and fatigue over the course of 31 visits between 10/20/20 and 6/11/21.

71. Plaintiff consulted with a naturopathic physician on two occasions for advice on dietary supplements and food choices.

72. Plaintiff received chiropractic adjustments to her shoulders, neck and back for pain relief.

73. Plaintiff treated regularly with an acupuncturist for pain relief treatment.

### *Mental Health Care*

74. Plaintiff experienced symptoms of anxiety, depression, and insomnia that re-occurred in January of 2020.

75. By March of 2020, these symptoms were sufficiently bothersome that Plaintiff consulted her PCP who prescribed psychotropic medications and recommended she see a mental health care specialist.

76. Plaintiff began seeing a psychiatrist in early March of 2020 and the psychiatrist diagnosed recurrent major depressive disorder and post-traumatic stress disorder ("PTSD") for which Plaintiff was prescribed medications.

77. Plaintiff saw that psychiatrist for care from early March of 2020 through mid-June of 2020.

78. Plaintiff discontinued her treatment with this psychiatrist in mid-June of 2020 when she disagreed with his medical approach.

79. However, Plaintiff continued to take the prescribed mental health medications.

80. By the fall of 2020, Plaintiff's mental health had deteriorated further, and her PCP recommended re-starting care with a mental health specialist.

81. In November of 2020 Plaintiff started care with a different psychiatrist who diagnosed her with depression, anxiety, and PTSD and updated her psychotropic medication regimen.

82. When she returned to see this psychiatrist in February of 2021, Plaintiff had been having "*pretty dark thoughts*" for which she had self-adjusted her medication upward. The psychiatrist adjusted her medications yet again.

83. Plaintiff was unable to continue treatment with this psychiatrist due to limitations of her health insurance.

84. Since February of 2021, Plaintiff has relied on medication management of her mental health provided by her PCP.

85. In addition to medication management of her mental health, since May of 2020 Plaintiff has had individual counseling with a therapist to address her mental health conditions.

### *Disablement and Disability Claim*

86. Plaintiff became disabled as of 5/6/20 and remained totally disabled from 5/6/20 through 1/25/21.

87. On 1/25/21, Plaintiff returned to a part-time work schedule with significant restrictions and limitations supervised by her PCP, Dr. Ann Barry.

88. As such, Plaintiff was partially disabled from 1/25/21 through 1/1/2022 when Plaintiff regained the ability to earn 80% of her pre-illness earnings.

89. Plaintiff submitted a claim for STD benefits to UNUM and was found entitled to STD benefits from 5/6/20 through 11/2/20, which was the maximum period for STD benefits under the STD plan.

90. Although UNUM had concluded Plaintiff was totally disabled from 5/6/20 through 11/2/20 for purposes of STD benefits, UNUM concluded Plaintiff was <u>not</u> totally disabled for the same period for LTD purposes.

91. UNUM denied Plaintiff's claim for LTD benefits by letter dated 1/27/21.

92. Plaintiff appealed to UNUM on or about 9/23/21.

93. By letter dated 2/25/22, UNUM issued a final decision on review concluding that Plaintiff was entitled to LTD benefits but only for the limited period of 11/2/20 through 3/26/21.

94. UNUM selected the end date of 3/16/21 because that was the date when Plaintiff's SLTD provider noted Plaintiff was able to speak for 30 minutes in a 2-hour workday.

95. Except for the period of 6/22/21 – 7/15/21 (when she attended the CPRC program at the Mayo Clinic), Plaintiff worked on a gradually increasing basis from 1/25/21 forward.

**COUNT I: CLAIM FOR BENEFITS DUE UNDER 29 U.S.C. §1132(a)(1)(B)**

96. Plaintiff incorporates all preceding allegations in this Complaint and further alleges as follows.

97. Plaintiff exhausted her administrative remedies under the LTD policy.

98. Plaintiff satisfied the UNUM LTD policy's definition of disability on either a total or partial disability basis from 11/2/20 and continuing thereafter to January 1, 2022.

99. UNUM's decision to deny LTD benefits from 3/16/21 through 1/1/22 is in breach of the policy and ERISA.

**WHEREFORE**, Plaintiff demands judgment against UNUM ordering the following:

(i) Pay her LTD benefits due from 3/16/21 through January 1, 2022, plus interest through the date of judgment;

(ii) Reimburse Plaintiff's costs, disbursements, and other expenses of this litigation, including reasonable attorneys' fees and experts' fees, pursuant to 29 U.S.C. §1132(g); and

(iii) Provide such other and further relief as the Court deems just and proper.

Dated: **May 13, 2022**   **Respectfully submitted:**

By: s/ Katherine L. MacKinnon
Katherine L. MacKinnon (#170926)
Nicolet Y. Lyon (#0391954)
LAW OFFICE OF KATHERINE L. MACKINNON, P.L.L.C.
2356 University Ave W. Ste. 230
(952) 915-9215 (ph.)
(952) 915-9217 (fax)
kate@katemackinnon.com
nicolet@katemackinnon.com
***Counsel for Plaintiff Sara F. Whitehouse***