UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Sara F. Whitehouse, | Civ. No. 22-1736 (JWB/ECW) |
| Plaintiff, | |
| v. | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT** |
| UNUM Life Insurance Company of America, | |
| Defendant. | |

Katherine L. MacKinnon, Esq., and Nicolet Lyon, Esq., Law Office of Katherine L. MacKinnon, counsel for Plaintiff.

Jake Elrich, Esq., Molly Renee Hamilton Cawley, Esq., and Terrance J. Wagener, Esq., Messerli & Kramer P.A., counsel for Defendant.

Plaintiff Sara Whitehouse, M.D., filed suit against Defendant Unum Life Insurance Company of America under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* Whitehouse claims Unum improperly terminated her long-term disability ("LTD") benefits after ongoing symptoms from what she suspects was COVID-19 kept her from working full time. Both parties seek judgment on the administrative record. Whitehouse seeks an award of benefits through the date she returned to full-time work, and Unum seeks affirmance of its decision denying benefits.

After reviewing the record, considering the parties' written and oral arguments, weighing the evidence, and examining applicable law, it is more likely than not that Whitehouse remained partially disabled under Unum's policy throughout 2021. Unum

must reinstate Whitehouse's benefits retroactively through December 31, 2021.

## FINDINGS OF FACT

The Findings of Fact below are either undisputed or have been proven by a preponderance of the evidence. To the extent that the Conclusions of Law include any Findings of Fact, they are incorporated here by reference.

The administrative record Unum developed to review Whitehouse's benefits claim was submitted as an exhibit to Unum's motion. (Doc. No. 17, Ex. A ("AR").) Each page is stamped with UA-CL-LTD-XXXXXX to indicate the page number. References to the administrative record will be styled as (AR XXX).

**I.     The Parties**

Defendant Unum Life Insurance Company of America issued Group Insurance Policy No. 609377 001 ("the Policy") to Fairview Health Services, effective January 1, 2020. (AR 169–227.) Fairview provided group disability insurance plans governed by ERISA to its employees through the Unum Policy. (AR 170.)

Plaintiff Dr. Sara Whitehouse, a physician licensed to practice in Minnesota, was employed by Fairview as a full-time addiction medicine specialist at St. Joseph's Hospital in St. Paul, Minnesota. (AR 11, 846, 848, 853.) Whitehouse was covered under the Policy and participated in the LTD benefit plan. (AR 11, 846.)

**II.    The Policy**

Under Unum's LTD Policy, Whitehouse is considered disabled when Unum determines that (1) she is limited from performing the material and substantial duties of her regular occupation because of sickness or injury, and (2) she has a 20% or more loss

in indexed monthly earnings because of the same sickness or injury. (AR 188.)

The Policy instructs disability benefits claimants to submit proof showing:

- the date your disability began;
- the existence and cause of your sickness or injury;
- that your sickness or injury causes you to have limitations on your functioning and restrictions on your activities preventing you from performing the material and substantial duties of your regular occupation;
- that you are under the regular care of a physician;
- the name and address of any hospital or institution where you received treatment, including all attending physicians; and
- the appropriate documentation of your monthly earnings, any disability earnings, and any deductible sources of income.

(AR 179.)

The Policy provides a gross monthly benefit of 60% of monthly earnings, up to $22,500 per month. (AR 175, 190.) For claimants like Whitehouse who work while disabled, the Policy calculates the monthly benefit by adding her disability earnings and gross disability payment. If that sum exceeds 100% of her indexed monthly earnings, the excess is subtracted from that month's disability benefit. (AR 194.) Disability earnings are defined as "the earnings which you receive while you are disabled and working, plus the earnings you could receive if you were working to your maximum capacity." (AR 206.) Certain income sources are fully deductible from the gross monthly benefit, including amounts paid under a salary continuation or accumulated sick leave plan. (AR 190, 194, 196.) The Policy's definition for "salary continuation or accumulated sick leave" excludes compensation paid for work performed after the disability begins, which is considered disability earnings. (AR 209.)

The Policy also indicates that disability benefit payments will stop at the

3

earliest of any of these events:

> - when you are able to work in your regular occupation on a part-time basis and you do not;
> - if you are working and your monthly disability earnings exceed 80% of your indexed monthly earnings, the date your earnings exceed 80%;
> - the end of the maximum period of payment;
> . . .
> - the date you fail to submit proof of continuing disability;
> . . .
> - the date you die.

(AR 198.) The maximum benefit duration for all disabilities for mental illness and disabilities mainly based on self-reported symptoms is 24 months. (*Id.*)

**III.    Whitehouse's Occupation**

Unum's vocational analyst determined that Whitehouse's job most closely aligned with the position of hospitalist. (AR 650.) A hospitalist is considered a light physical demand job where standing, walking, and talking are performed for one- to two-thirds of the workday, or up to 5.5 hours a day. (AR 651.)

**IV.    Whitehouse's Illness, Symptoms, and Treatment History**

In March 2020, Whitehouse was working full-time at St. Joseph's Hospital, which had been designated as a COVID-19 patient deployment center. (AR 854.) Whitehouse suspects she provided care without wearing personal protective equipment to a patient possibly infected with COVID-19. (*Id.*) Members of her family fell ill around the same time. (AR 855.) Because testing was not widely available at that early stage of the pandemic, the illnesses were not confirmed to be COVID-19. (*Id.*)

On March 31, 2020, Whitehouse became ill with nausea, fatigue, abdominal pain, and widespread body aches. (*Id.*) She was diagnosed virtually with presumed COVID.

4

(*Id.*) Whitehouse returned to work after a week of recovery, but after about three weeks she became increasingly short of breath, so much that she had trouble talking or walking without losing her breath. (*Id.*) She also felt extraordinarily fatigued, which was unusual given that she enjoyed competing in triathlons and marathons, recreationally bicycling, hiking, swimming, and camping and backpacking. (*Id.*; *see also* AR 853.)

Whitehouse's shortness of breath and fatigue worsened so much that her primary care physician directed her to seek emergency room treatment on May 7, 2020. (AR 855–56, 1649–51.) The ER provider diagnosed an asthma exacerbation and prescribed prednisone. (AR 1652–61.)

After that point, Whitehouse experienced a range of symptoms and conditions for which she sought examination and treatment, including viral cardiomyopathy, vocal cord dysfunction, fatigue, chronic pain, anxiety, depression, and post-traumatic stress disorder. She was evaluated regularly by her treating physicians, Dr. Lauren Graber and Dr. Ann Barry, and saw various providers, including:

- Dr. Robert Roddy for psychiatric treatment from March 11, 2020 to June 17, 2020 (AR 1387–96);
- Nancy Mulvey, MSW, LICSW for individual counseling from May 2020 to March 2021, and ongoing family therapy (AR 1814–17);
- Dr. Robert Coon for psychiatric treatment on November 23, 2020 and February 17, 2021 (AR 1581–89);
- Dr. Scott Corbett for osteopathic care from October 2020 through June 2021 (AR 1546–71);
- Julie McCormick for acupuncture treatment from February to July 2021 (AR 2003–30);
- Dr. Michael Johnson for chiropractic treatment from April to May 2021 (AR 2031–33); and
- Various doctors, nurses, and specialists at the Mayo Clinic, including speech therapists and those who treated Whitehouse at the pain management program in summer 2021 (AR 1422–1544).

Whitehouse could not work until January 2021, when Dr. Barry authorized a gradual return to work plan. Based on Whitehouse's continuing symptoms of fatigue, pain, and difficulty speaking, Dr. Barry provided opinions on the appropriate restrictions and limitations for Whitehouse in office notes from January to May 2021. (AR 842–43, 1609, 1612, 1616, 1620, 1630.) Whitehouse began working two half days per week, increased to two full days per week in February 2021, and eventually increased to three full days per week by the end of March 2021. (*Id.*) Dr. Barry held Whitehouse to the three full days per week (60% capacity) through May 2021, as Whitehouse continued to report symptoms and stated that she felt incapable of working more hours. (*Id.*)

In the meantime, on February 10, 2021, Dr. Jayanth Adusumalli at the Mayo Clinic found that Whitehouse fit the criteria for chronic fatigue syndrome and presented consistent with a central sensitization disorder. (AR 1521–26.) She was found to suffer from a substantial decrease in function persisting for more than 6 months, post-exertional malaise, unrefreshing sleep, cognitive impairments, and orthostatic intolerance (difficulty standing upright). (*Id.*) She was recommended to participate in the Mayo Clinic's three-week pain management program to engage in treatment and learn how to manage her symptoms. (*Id.*; *see also* AR 908–18.)

Whitehouse also received steroid injections in her neck, which helped resolve her neurogenic cough in March 2021. (AR 1506–09, 1513.) Although the injections helped Whitehouse speak for a longer duration, the increased talking activity caused her fatigue and discomfort. (AR 843, 1506.)

After Whitehouse completed the pain management program in July 2021, program representatives wrote a letter describing her progress and setting out continuing restrictions and limitations for her return to work. (AR 1818.) The providers recommended Whitehouse gradually increase from three half days to three full work days per week over the five weeks following the program. (*Id.*) Dr. Barry agreed with "a very slow return to work as even her past reduced work hours were causing some strain" and imposed limited work hours through August 2021. (AR 1603.)

Whitehouse continued working at 60% capacity for the rest of 2021 and returned to full-time work in January 2022.

**V.     Unum's Benefits Determinations**

    **A.     Short-term disability ("STD") granted**

In July 2020, Whitehouse submitted a claim for short-term disability ("STD") benefits. (AR 55, 846.) Her attending physician at the time, Dr. Graber, stated that Whitehouse's primary diagnosis was "dyspnea secondary to myocarditis" beginning on May 7, 2020, and that Whitehouse experienced a range of symptoms such as inability to speak in full sentences, difficulty sustaining conversations, and an inability to climb stairs or walk more than one block. (AR 56–57.) Unum approved the claim, finding Whitehouse was disabled as of May 7, 2020, and paid the STD benefit for the full 180-day period, ending on November 2, 2020. (AR 11–14, 301.)

    **B.     Long-term disability ("LTD") denied; Whitehouse appeals**

Whitehouse applied for LTD benefits on October 29, 2020. (AR 2.) Her claim included a letter from Dr. Barry stating that Whitehouse was "currently recovering from a

severe viral illness that caused a Viral Cardiomyopathy, Severe Deconditioning[,] and Vocal Cord Dysfunction all causing severe shortness of breath and fatigue that has been disabling." (AR 63.) Whitehouse was estimated to resume work on November 16, 2020, but Dr. Barry later extended Whitehouse's work restrictions to January 11, 2021, because of ongoing symptoms. (AR 376–82.)

Unum denied Whitehouse's LTD claim on January 27, 2021, finding that work restrictions were not supported for the 180-day LTD elimination period (which overlapped with the STD benefits period). (AR 759–61.) Even though Unum had found Whitehouse disabled for purposes of awarding STD benefits from May 7 to November 2, 2020, Unum's physicians reviewing her LTD claim opined that from May 7, 2020 forward, the medical records did not support a finding that Whitehouse's conditions were so severe that she could not perform her job full time. (AR 761.)

Whitehouse appealed the denial on September 20, 2021. (*See generally* AR 819–72.) Her appeal included letters from counsel, statements, opinion letters, more medical records, medical logs, and medical articles. (AR 819.) Whitehouse argued that her medical condition rendered her completely disabled from May 2020 to January 2021, and then partially disabled after that. (*Id.*)

C. **Dr. Norris reviews Whitehouse's appeal**

Unum referred Whitehouse's appeal for review to Dr. Scott Norris, whose listed specialties are Family Medicine, Occupational Medicine, and Aerospace Medicine. (AR 1897.) Dr. Norris assessed the conditions Whitehouse had reported, as well as her comorbidities, behavioral health history, and the corresponding medical records. (*See*

*generally* AR 1897–1903.) He determined that the medical records supported restrictions and limitations that precluded Whitehouse from performing tasks requiring frequent talking for the period from May 7, 2020 to March 16, 2021, but not after that. (AR 1902–03.) Having considered "all conditions individually and in aggregate," Dr. Norris concluded that, as of March 16, 2021, the medical evidence did not support restrictions or limitations based on physical, behavioral health, or cognitive conditions "when considered individually or collectively" that would have precluded Whitehouse from performing light demand occupational activity. (AR 1902-1903.) He opined that Whitehouse's conditions either had sufficiently improved or were not sufficiently supported by medical evidence to warrant further work restrictions, but he did not further detail his aggregate analysis. (*Id.*)

Unum provided Whitehouse an opportunity to review and respond to Dr. Norris's report. (AR 1934–38.) Through counsel, Whitehouse submitted more medical records from acupuncture and chiropractic visits, office visits with Dr. Barry and other providers, records from Whitehouse's providers at the Mayo Clinic pain management program, a medical log prepared by counsel, a statement from a coworker, and medical literature relating to central sensitization. (AR 1988–2002, 2003–116.)

Dr. Norris then issued a supplemental report, finding that Whitehouse's additional materials did not alter the outcome. (*See* AR 2129–34.) He again declared that he had considered Whitehouse's conditions individually and in the aggregate, and found her new medical records insufficient because the records did not include physical findings that support ongoing impairment and her providers did not impose work restrictions. (AR

9

2132–33.) He reiterated that his comments from the initial review continue to apply, specifically stating that although Whitehouse reported persistent fatigue, her part-time return to work and "substantial reported activities" went against fatigue that would preclude light occupational work. (AR 2133.) Dr. Norris also found that the records from the Mayo Clinic pain rehabilitation program in July 2021 did not show fatigue that would preclude Whitehouse from work. (*Id.*)

Unum again permitted Whitehouse to review and respond, but she declined. (AR 2137–38, 2141.) On February 25, 2022, Unum issued a letter adopting Dr. Norris's findings. (*See* AR 2145–56.) Unum then paid Whitehouse LTD benefits through March 15, 2021. (AR 2214.)

## VI. Procedural History

Whitehouse filed this ERISA lawsuit on July 8, 2022. (Doc. No. 1.) The parties eventually stipulated to cross-move for judgment on the administrative record under Fed. R. Civ. P. 39(a)(1) and 52(a)(1), to determine (1) whether Unum wrongfully terminated Whitehouse's benefits; (2) whether Whitehouse proved by a preponderance of evidence that she is entitled to benefits from March 16, 2021 through December 31, 2021; and (3) the appropriate remedy. (*See* Doc. No. 24 at 1.) The parties also agreed that Unum's administrative record will provide the evidence for consideration and be reviewed de novo. (*Id.* at 2.) The parties appeared for a hearing on the cross-motions on August 28, 2023. (Doc. No. 33.)

# CONCLUSIONS OF LAW

## I. Legal Standard

By agreement, Unum's LTD benefits decision is reviewed de novo. (Doc. No. 24.) Under that standard, the district court acts as the fact finder, resolving factual disputes, making credibility determinations, and weighing the evidence against the governing policy. *See Avenoso v. Reliance Std. Life Ins.*, 19 F.4th 1020, 1026 (8th Cir. 2021). Whitehouse bears the burden of proving by a preponderance that she is entitled to payment of LTD benefits under her employer's ERISA plan. *See Farley v. Benefit Tr. Life Ins.*, 979 F.2d 653, 658 (8th Cir. 1992).

Upon review, the evidence shows that Whitehouse was partially disabled under Unum's LTD Policy from January 25, 2021 through December 31, 2021.

## II. Analysis

### A. Disability Benefits Determination

#### 1. Dr. Norris's rationale for denying benefits is not persuasive

Although this matter is reviewed without deference to Dr. Norris's decision to deny benefits as of March 15, 2021, his credibility bears on the parties' cross-motions because Unum points to his work as support for awarding judgment in its favor. Although Dr. Norris identified the records he reviewed and explained his opinions on Whitehouse's symptoms, examination results, and ability to perform a light demand occupation, his analysis is questionable for several reasons.

First, Dr. Norris treats Whitehouse's subjective reports inconsistently. He selectively accepts her reports of improvement while rejecting her reports of setbacks and

11

ongoing symptoms. Taking Whitehouse at her word only when it supports denying benefits and either questioning or disregarding it otherwise harms Norris's credibility. In addition, instances of successful physical activity say nothing about Whitehouse's response to that activity, when other medical records indicate that she persistently suffered from significant fatigue and malaise following physical exertion. Moments of physical improvement do not show that Whitehouse's conditions had resolved or that she no longer required a work hours limit.

Second, although Dr. Norris analyzed each component of Whitehouse's condition individually, he failed to specifically analyze their collective effect. Merely declaring that he had considered all conditions individually and collectively, without providing any resultant collective analysis or a justification for not doing so, is not persuasive. Dr. Norris does not address that the combined effect of Whitehouse's individual health issues could collectively produce a disability when any individual condition may appear insufficient viewed in isolation on its own.

Third, Dr. Norris focused too strictly on the lack of work restrictions to disregard providers' records, while ignoring a major ongoing restriction. Dr. Norris concluded no restrictions or limitations were imposed after March 2021, but Dr. Barry continually restricted Whitehouse from working more than 60% of a full work week throughout 2021. Dr. Barry's notes in April and May 2021 revealed that the 60% hours limit was justified and needed to remain "for the foreseeable future" barring any setbacks. (AR 1609, 1612.) Dr. Barry also accepted the Mayo Clinic's recommendation in July 2021 for "a very slow return to work as even her past reduced work hours were causing some

strain," and imposed limited work hours into August 2021. (AR 1603.) Although some providers did not impose restrictions, they still recognized how Whitehouse's symptoms affected her physically. Similarly, Dr. Norris dismissed certain materials as not "time relevant," even though he was asked to review whether Whitehouse's medical file supported work restrictions as of March 16, 2021 *and beyond*. (AR 2133.) Waving away certain records based on the lack of restrictions or based on their timing is hardly a full and credible evaluation of Whitehouse's claim.

Finally, Dr. Norris faults Whitehouse for failing to provide objective evidence to verify symptoms that Unum defines as unverifiable, and relies on her history of normal test results despite Whitehouse being diagnosed with a condition that accounts for individuals with a normal test history.

Unum's Policy recognizes that headaches, pain, fatigue, and loss of energy are not verifiable using tests, procedures, or clinical examinations. (AR 210.) Although the Policy requires claimants to submit proof of their symptoms, the cause, and resulting limitations, the Policy separately permits self-reported, non-verifiable symptoms to serve as the primary basis for a disability claim for up to 24 months. Under such a policy, lack of objective evidence is a *factor* in weighing a claimant's submitted materials and assessing a claimant's credibility. *See Johnson v. G & K Servs., Inc. Long Term Disability Plan*, Civ. No. 15-3789 (WMW/KMM), 2017 WL 9274764, at *7–8 (D. Minn. Sept. 27, 2017), *R&R adopted by* 2017 WL 6021292 (D. Minn. Dec. 5, 2017). Unum and Dr. Norris treat objective evidence as a threshold evidentiary requirement, not a factor to be weighed alongside the rest of the claim submission.

Dr. Norris opined in both his initial and supplemental report that the records did not support a diagnosis of chronic fatigue syndrome because examinations and testing did not identify certain symptoms. (AR 1903, 2133.) But chronic fatigue syndrome is known not to be amenable to objective testing and presents in patients with a history of normal test results. *Cf. Wilkins v. Hartford Life and Acc. Ins.*, 299 F.3d 945, 947 n.1 (8th Cir. 2002) (stating that chronic fatigue syndrome is difficult to diagnose and treat, and may not always be disabling, and criticizing lack of objective medical evidence as the primary reason to deny disability benefits based on chronic fatigue syndrome); *Abram v. Cargill, Inc.*, 395 F.3d 882, 887 n.3 (8th Cir. 2005) ("While fatigue is difficult to assess, disability plan administrators may not require objective medical evidence of the cause if there is consistent evidence of disability symptoms, and no finding that the claimant is not credible in her complaints."); *Sisco v. U.S. Dept. of Health and Hum. Servs.*, 10 F.3d 739, 745 (10th Cir. 1993) ("[B]ecause chronic fatigue syndrome is diagnosed partially through a process of elimination, an extended medical history of 'nothing-wrong' diagnoses is not unusual for a patient who is ultimately found to be suffering from the disease.").

Whitehouse's chronic fatigue syndrome diagnosis, plus her reports of ongoing pain and fatigue and their impact on her ability to work, are not upended by the lack of objective tests. Dr. Norris does not explain why Whitehouse's normal test results are inconsistent with the types of symptoms and limitations associated with chronic fatigue syndrome and central sensitization. Under the circumstances of this case, the lack of objective evidence and history of normal examination results do not weigh so heavily against a conclusion that Whitehouse remained disabled.

Dr. Norris's views do not support Unum's position to discontinue LTD benefits. Rather, the record supports Whitehouse's claim.

### 2. The record supports a benefits award

Whitehouse contracted a viral infection in March 2020 that resulted in intermittent and varying conditions and symptoms affecting her heart, her throat, her ability to speak, her ability to physically exert herself, her mental health, and her experience of pain and fatigue. Based on the evidence in the administrative record, it is more likely than not that the cause of Whitehouse's conditions and symptoms was the viral illness she contracted in March 2020 and suspects (but could not confirm) was COVID-19.

Whitehouse's physical ailments prevented her from working throughout 2020, although she showed some improvement. After returning to part-time work in 2021, she reported progress at times and a recurrence of symptoms at others. While her viral cardiomyopathy had resolved and her mental health stabilized, her remaining conditions continued to affect her health and ability to work.

Whitehouse's voice and throat issues greatly improved following her neck injections but were not sufficiently resolved as of March 15, 2021. Records indicate that Whitehouse could talk for a few hours but needed to continue building toward full-time work. Given that her job required up to 5.5 hours of speaking a day, Whitehouse's lingering voice and throat issues impacted her ability to meet that requirement past March 15, 2021.

More substantially, Whitehouse's chronic pain and severe fatigue persisted well into 2021. Her pain and fatigue are documented throughout the record, as well as her

15

efforts to address those issues through western medicine and non-allopathic methods. Her treating physician repeatedly restricted Whitehouse's work hours to no more than 60%, and in July 2021, the providers at the Mayo Clinic pain rehabilitation program recommended a gradual return to working eight hours per day, but only for three days a week. Two times, in January and July 2021, Whitehouse's providers recommended an incremental, weeks-long return to part-time work.

Another key support for Whitehouse's claim is her February 2021 diagnosis of chronic fatigue syndrome and central sensitization disorder. Consistent with that diagnosis, Whitehouse's acupuncture and chiropractic records from February to July 2021 indicate varying levels of pain and progress. Whitehouse also followed the recommendation to participate in the Mayo Clinic pain management program.

Dr. Sutor, a psychiatrist with the Mayo Clinic pain management program, reported that Whitehouse presented to the program as extremely fatigued and became quickly exhausted with even minimal physical activity, and that her fatigue caused her to experience cognitive inefficiencies that would make her physician work extremely difficult or even unsafe. (AR 2034.) Just a week after the program, Whitehouse reported burning pain in her neck and upper back from increasing her activity levels. (AR 2029.)

Even as of September 2021, Dr. Barry said that a 60% limit on work hours was still warranted based on Whitehouse's physical abilities. Although Whitehouse could push through a full workday, the resulting fatigue and pain prevented her from doing so more than three times in a week. Whitehouse submitted pay stubs reflecting that she did not work more than 48 hours of regular time in a two-week pay period—consistent with

16

that 60% limitation—for the rest of 2021. (Doc. No. 22 at 5–41.)

Without evidence that Whitehouse's subjective reports of pain, fatigue, or other symptoms were discounted by Dr. Barry or the other providers who treated her, the lack of objective medical tests is not outcome determinative. Whitehouse consistently reported her improvements and setbacks alike, as she experienced them. She also displayed a desire to return to work, and regularly consulted Dr. Barry on her capability to work. Combined with the fact that Whitehouse did not resume full-time work until January 2022, there is sufficient evidence that she continued experiencing symptoms consistent with her long-term recovery from the viral infection and diagnosed chronic fatigue syndrome that affected her ability to work throughout 2021.

Therefore, Whitehouse remained disabled under Unum's policy until returning to full-time work in January 2022. She is entitled to benefits for that period.

### 3.     Time Off Time Away ("TOTA") earnings

The parties disagree over how TOTA pay figures into Whitehouse's disability benefit award. Whitehouse earned TOTA hours as she returned to work, and then claimed payment for those hours as the balance became available. Unum contends that TOTA earnings are considered accumulated sick leave under the Policy and fully deductible from the gross disability benefit. Whitehouse argues that TOTA earnings are disability earnings and deducted only to the extent that they cause her monthly benefit to exceed her indexed monthly earnings. The distinction results in an approximately $7,000 difference between the parties' calculation of Whitehouse's unpaid LTD benefits.

Upon review, Whitehouse's TOTA payments in February, March, and August

through December 2021 function as salary continuation and not compensation for work performed. The Policy defines deductible salary continuation or accumulated sick leave as "continued payments . . . of all or part of your monthly earnings, after you become disabled . . . ." (AR 209.) Whitehouse is correct that she accumulated TOTA hours based on her actual time worked. But when redeeming her allocated TOTA hours for payment, she is not working during those hours. Therefore, TOTA functions like accumulated sick leave and not payment for work performed. Accordingly, the TOTA payments are fully deductible from Whitehouse's monthly gross disability benefit.

Incidentally, were TOTA considered disability earnings as Whitehouse desires, she would have become ineligible for benefits as of November 2021, when her disability earnings (regular time plus TOTA time) exceeded 80% of her indexed monthly income.

Based on Whitehouse's paystubs, and following the Policy's benefits calculation formula, Whitehouse's unpaid disability benefit for the rest of 2021 is $71,649.90.

B. Prejudgment Interest

Prejudgment interest should be awarded unless exceptional circumstances render such an award inequitable. *Gordon v. Nw. Airlines, Inc. Long-Term Disability Income Plan*, 606 F. Supp. 2d 1017, 1040 (D. Minn. 2009) (citations omitted). No such circumstances preclude awarding prejudgment interest here.

The amount of interest is calculated by applying the rate in 28 U.S.C. § 1961 to the amounts from the months in which Whitehouse was wrongfully denied benefits. *See, e.g.*, *Lanpher v. Metro. Life Ins.*, Civ. No. 12-2561 (JRT/JSM) 2015 WL 4920042, at *4 (D. Minn. Aug. 18, 2015); *Nelson v. Metro. Life Ins.*, Civ. No. 07-2326 (ADM/JSM),

18

2010 WL 153040, at *10 n.6 (D. Minn. Jan. 11, 2010). The final amount will be determined after Whitehouse submits an updated calculation based on the disability benefits she was wrongfully denied from March through December 2021.

### C. Attorney's Fees

ERISA provides the reviewing court with discretion to award attorney's fees and costs to either party. *See* 29 U.S.C. § 1132(g)(1). Although there is no presumption for awarding fees, a prevailing ERISA plaintiff rarely fails to receive fees. *See Starr v. Metro Sys., Inc.*, 461 F.3d 1036, 1040 (8th Cir. 2006). A decision on attorney's fees will be made after Whitehouse briefs and supports her claim for awarding fees and costs here. Unum will be allowed to respond.

## ORDER

Based on the above, and on all the files, records, and proceedings here, **IT IS HEREBY ORDERED** that:

1. Defendant Unum Life Insurance Company of America's Motion for Judgment on the Administrative Record (Doc. No. 14) is **DENIED**.

2. Plaintiff Sara F. Whitehouse's Motion for Judgment on the Administrative Record (Doc. No. 19) is **GRANTED**.

3. Defendant is ordered to pay Plaintiff damages of $71,649.90 for her lost benefits, plus prejudgment interest in an amount to be determined.

4. Within 14 days of the date of this Order, Plaintiff shall submit an affidavit calculating updated prejudgment interest on the disability benefits she was wrongfully denied from March through October 2021.

5.      Within 14 days of the date of this Order, Plaintiff shall submit a memorandum of no more than 5 pages establishing the legal basis to award her reasonable costs and attorney's fees, and an affidavit substantiating the amount of her claimed costs and fees. Defendant may submit a response of no more than 5 pages 10 days later. Plaintiff may submit any reply within 10 days of Defendant's response.

Date: March 21, 2024                    *s/ Jerry W. Blackwell*
                                        JERRY W. BLACKWELL
                                        United States District Judge